(No. 19878.—

JAMES C. WEAVER, Appellee, *vs.* ELSIE ZIMMER *et al.* Appellants.

*Opinion filed December 20, 1929.*

JOHN E. CASSIDY, for appellants.

ERNEST J. GALBRAITH, for appellee.

Mr. CHIEF JUSTICE FARMER delivered the opinion of the court:

James C. Weaver filed a bill in the circuit court of Peoria county on March 1, 1928, seeking to obtain the conveyance to himself of two lots having a six-room frame

dwelling house thereon, situated in the city of Peoria. The record title to the property is in the name of complainant's daughter, Elsie Zimmer, and she and her husband were made defendants to the bill. After answer and replication were filed the cause was referred to a master in chancery to take the proof and report his conclusions of law and fact. The master made his report finding the facts substantially in accordance with the allegations of the bill and recommended that a decree be entered rescinding an oral contract between complainant and his daughter, and that she and her husband be required to convey the property to her father upon the payment to her of the sum of $1028.70, which amount she had expended for various improvements upon the property and in making all the payments after January, 1917, upon the purchase price of the premises. Objections to the master's report were overruled and stood as exceptions before the chancellor. The chancellor overruled the exceptions, approved the master's report, and a decree was entered as recommended by the master. From that decree the daughter and her husband have prosecuted an appeal to this court.

The proof was taken by one master in chancery, and a report thereon, by stipulation of counsel, was made by another master. The record discloses that appellee had originally negotiated for the purchase of the property involved some time prior to the year 1909 and made payments thereon amounting to $500 or more. The property appears to have been sold for taxes while appellee was in possession, and through one Schrier, as agent for Maggie Lehr, she became the owner. A new contract for sale was executed September 1, 1909, by Maggie Lehr and appellee and his wife, whereby the latter agreed to purchase the property for $1220. Payment therefor was to be made at the rate of $12 per month on the first day of each month, with interest at six per cent per annum on the balance unpaid. The contract also provided that when $620 had been

paid on the purchase price a warranty deed would be given to the purchasers and the balance due should be secured by a mortgage on the property. This agreement was introduced in evidence, and on the back thereof were endorsed the amounts of principal and interest paid each year from September 1, 1910, to September 1, 1916. The last payment endorsed thereon was September 1, 1916, and the total amount of principal shown to have been paid up to that time was $591.64. According to the statement of appellee other payments were made upon the purchase price, but no endorsements or receipts therefor were shown.

Appellee was a laborer, and for some time prior to January, 1917, he, his wife and at least two of his children, one of whom was his daughter, Elsie, who is one of the appellants here, resided upon the property here involved. Appellee was then about fifty-six years of age. About this time he was having domestic difficulties and became somewhat financially embarrassed on account of bills that had been created against him by his wife. He and his wife separated, and shortly thereafter a divorce was obtained by him. For some years Elsie, while living at home, had worked out by the day as a domestic servant, doing washings, ironings and other household duties for private families in the vicinity of Peoria. According to appellee's testimony the daughter proposed that her father obtain a conveyance of the premises from Maggie Lehr to her; that she would pay off the balance due on the purchase price of the property, which appellee stated was in amount of $575, and that the daughter would provide for and support him the balance of his life. The daughter's testimony as to the transaction was that her father called her on the 'phone one day while she was doing domestic work in one of the private homes where she rendered such services, and told her that he wanted her to come down-town immediately and go with him to Schrier's home; that Schrier had telephoned him and said he was back in his payments on

the contract and that Schrier would have to take the property. She stated that she came down-town and met her father, and together they went out to Schrier's home, in Peoria. Schrier was the business agent of Maggie Lehr and payments on the contract for the purchase of the premises were made to Schrier. As the result of the visit and negotiations at Schrier's home a warranty deed for the property was executed by Maggie Lehr to Elsie in consideration of one dollar and other good and valuable consideration. The deed was executed on January 25, 1917, and was duly recorded on the following day. Apparently appellee's wife had left the home, and Elsie, her father and one of her brothers continued to live there after January, 1917. She worked out during the day as before, but took care of the house, did the cooking, and her father and her brother each paid her $7.50 per week board. The father also continued to work at various employments. The brother was married and left home during 1922. In May, 1923, Elsie married Tony Zimmer. She, her husband and her father lived upon the premises, and the father continued to pay board to Elsie until about December, 1927. He seems to have been out of employment about this time, and according to his testimony Elsie told him one morning in February, 1928, that she would not give him another meal unless he paid for it. Thereafter he discontinued eating at the Zimmer home but has ever since that time kept and occupied a room there, where he sleeps. He testified that the rental value of the property was about $20 per month. He admitted that Elsie had made several improvements upon the property; that she had paid all the taxes upon the premises for the past ten years, paid the insurance on the furniture, a part of which belonged to her, and all other expenses. He further stated that he had his meals and room at her house after she was married, until February, 1928; that he had no trouble with anybody; that

he now stayed in his room at her house every night; that he just had the one conversation with her about her breaking her agreement with him. He further stated that Elsie had never refused to furnish him with a meal, and that he had never asked her to serve him after what she told him in February, 1928. He stated that since February, 1928, he had taken his meals with his other children and sometimes with friends and neighbors. He also testified that Elsie raved when he went into the house—threw herself on the bed; that he could not talk with her and that she threatened to have him arrested.

There was additional testimony presented by two or three of appellee's children and the wife of one of the sons, to the effect that they had heard Elsie say she had agreed to keep her father the rest of his life in consideration of his having had the property transferred to her.

Elsie Zimmer, the daughter, denied that she had ever had a conversation with her father concerning the transfer of the property to her prior to the day they went to Schrier's home. She denied that she ever entered into a verbal agreement with her father whereby she was to take the property and keep him the rest of his life. She also denied she ever made any such statements to any of her brothers or sisters relative to the property or the keeping of her father for the rest of his life. Her understanding, in substance, was that her father was in arrears with his payments upon the premises; that he had been having domestic difficulties; that he was financially embarrassed, and that he preferred having the property go to her rather than to real estate men or strangers. She stated she was obliged to pay some back payments on the property before the deed was issued to her and before she executed a mortgage for $575 to secure the additional unpaid balance on the property. She stated that her father told her he was going to remain with her and pay board, and this he had done for a period of ten years. She had no income or property of

her own, and she continued to wash and iron and do domestic work in private homes on the bluff at Peoria, where she earned from two to three dollars per day, which she used to complete the payments upon the property. She described the various improvements she had made to the property since taking it over in 1917 and gave the cost of the major portion of them. She denied having refused to furnish board to her father, and stated that the arrangement at her home continued to be the same after she was married as it was prior thereto, and that her father continued to eat with her and her husband for about five years after her marriage, and that he was still at her house but was not getting his board because he refused it himself. She stated her health was getting bad and the family were merely trying to get the place back in her father's name.

Maggie Lehr, who was the grantor in the deed to Elsie Weaver and who was also one of the parties to the original contract for the sale of the property to appellee, testified that she had discussed with her agent, Schrier, about Weaver being back in his payments of purchase on the property, and that Schrier told her Weaver was in arrears at the time his daughter took over the property. Both Schrier and his wife died prior to the hearing of this case.

There are two questions presented by this record for our consideration. The first and important one is whether or not Elsie Zimmer had an agreement with her father in January, 1917, when she took title to the premises, whereby she was to keep and provide for her father for the rest of his life in consideration of his giving her the benefit of the payments previously made by him upon his contract for the purchase of the property. The second question is, if there was an agreement between the father and daughter has the latter violated or repudiated it?

The master found that Weaver procured a conveyance of the premises from Maggie Lehr to Elsie Weaver, his daughter, for no other consideration than that Elsie would

pay off the balance due on the contract and would furnish support and maintenance to him when needed or requested by him, for the rest of his life. He further found that Weaver paid board to his daughter because he thought so much of her. Weaver was about fifty-six years of age when the property transfer took' place. The daughter had always lived at home without paying board, and according to the proof had earned some money doing domestic work in private families. The father stated he thought a lot of her and that she had a great influence over him. He had been having serious domestic difficulties with his wife, causing him some worry and much financial distress. If he was in arrears in his monthly payments on the property the sum was not large in comparison to the amount which he had previously paid toward the purchase and ownership of his home. He stated he had paid approximately $1200 or $1400 on the property and owned practically all of the furniture in the house. Rather than make some arrangement with strangers, to whom the transfer of the property doubtless could have been made and thereby obtain some financial assistance, of which he was sorely in need at the time, he evidently chose to try to obtain the property for his daughter. No doubt he also had in mind the keeping together of the balance of his family, namely, the daughter and son, with whom he could continue to live. There is no satisfactory proof that he was back in his payments on his contract of purchase. He states positively that he was not in arrears, and the testimony of Mrs. Lehr is merely what her deceased agent told her. The receipt primarily relied upon by Elsie to establish that she paid over $144 for back payments on her father's purchase contract conclusively shows on its face that it was not a receipt for any such payment but was one issued for payment of principal and interest on the "loan of $575." It is true, appellee stated that when he and his daughter made the agreement about the property there was nothing said about paying

board or furnishing clothes. Counsel for appellants makes much of the fact that appellee paid board to his daughter for ten years after the deed was made to her and that he remarked at the hearing, "Why I paid board puzzles me." He explained this statement when he said he thought so much of his daughter and did about what she asked him to do. He also stated he did not want anything from his daughter until he needed it. Though the testimony of the other children may be tinged with bias and prejudice in favor of their father, yet their evidence tends to strengthen the conclusion reached by the master and chancellor that there was an understanding or agreement between Elsie and her father at the time of. the transfer of the property to her in 1917. We have read all of the testimony from the record and are inclined to agree with that conclusion.

Having found that there was an agreement between the parties, has it been violated or repudiated by the daughter to such a degree as to warrant a court of equity compelling her to convey the property to the father? A conveyance of real estate made by a parent to a child in consideration of a promise that the child will care for and support the parent in his old age or will furnish a comfortable home for the parent during his life will be set aside and the property restored to the parent by a court of equity where the child, after receiving the conveyance, repudiates or fails to keep his agreement. (*Cooper* v. *Gum,* 152 Ill. 471; *McClelland* v. *McClelland,* 176 id. 83; *Hensan* v. *Cooksey,* 237 id. 620.) A deed executed by a parent under such circumstances belongs to a class distinguished by the courts from ordinary deeds of bargain and sale, in that the grantor gives up his property for the consideration of future comfort and support, which a court of equity cannot compel the grantee to furnish and a court of law cannot compensate with damages. If the evidence is such as to justify a conclusion that an agreement of that kind was entered into with a fraudulent intent or has been abandoned or re-

pudiated a court of equity will set aside the conveyance. The failure to perform on the part of the child or grantee must be substantial and in relation to material matters. If the grantor or parent prevents the grantee from carrying out the agreement there can be no presumption of fraud or sufficient repudiation of the agreement to justify setting aside the deed. (*Russell* v. *Robbins,* 247 Ill. 510; *Williams* v. *Langwill,* 241 id. 441.) In the case before us, Weaver has lived with his daughter for a period of ten years— about six years prior to her marriage and four years afterward. He was sixty-seven years old at the time of the hearing. He stated he had talked with his daughter but once about her breaking her agreement with him, when she said in February, 1928, that he could not eat at her house any longer unless he paid for it. He testified his daughter told him the reason was that her husband said so. His testimony also discloses that he had no trouble with his daughter's husband, that his daughter had not since refused to furnish him with meals, and that he had never asked her to serve him with food. Elsie denies that she has ever told her father that he could not eat at her house, and further states that he is not getting his board because he refused to eat there. No other witness testified to any difficulty between the parties. Some differences may have arisen in the household, which from the experience of most persons is not an uncommon situation. Ill-health to some extent was experienced by the daughter, and this may have affected her disposition at times. The advanced age of the father may also have assisted in developing some whims or eccentricities in him and he may have been prejudiced to some extent by his other children. The proof shows he continues to have a room and to sleep at his daughter's house but takes his meals with other children or elsewhere.

We think the record insufficient to authorize a court of equity to take away from the daughter the property which she has long used and occupied as a home and which

apparently she is still willing to share with her father for the same purpose.

The decree of the circuit court will therefore be reversed and the cause remanded, with directions to dismiss appellee's bill for want of equity.

*Reversed and remanded, with directions.*